Hamilton & Company, Inc. v. Commissioner.
Hamilton & Co. v. Commissioner
Docket No. 67197.
United States Tax Court
T.C. Memo 1959-153; 1959 Tax Ct. Memo LEXIS 92; 18 T.C.M. (CCH) 665; T.C.M. (RIA) 59153; July 31, 1959
*92 Winston B. McCall, Esq., for the petitioner. Frederick T. Carney, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion ARUNDELL, Judge: Respondent has determined deficiencies for the calendar years 1953 and 1954 in the amounts of $5,311.64 and $5,400, respectively. The primary issue is the reasonableness of the salary paid to petitioner's president. Respondent has reduced the deduction claimed by petitioner from $30,000 for each year to $12,000 per annum. Findings of Fact Hamilton & Company, Inc., is a corporation which was organized under the laws of the State of Alabama on January 1, 1926, under the name of A. J. Goodwin & Company, Inc., with an authorized issue of 350 shares of no par common stock with a stated value of $10 per share. J. Ralph Hamilton became the controlling stockholder in A. J. Goodwin & Company, Inc., on January 20, 1930, by the purchase of 315 shares of stock for $50,000 from A. J. Goodwin. Hamilton's purpose in purchasing the stock of Goodwin & Company was to acquire control of a going insurance business, with all the rights and interests in all insurance accounts, including renewal rights, that were on the *93 books of the company. On November 5, 1945, the name of the corporation was changed to Hamilton & Company, Inc. Concurrent with the reorganization the following officers were elected: J. Ralph Hamilton
President
W. H. Bryant
Vice President
Leota T. Houser
Secretary-Treasurer
The common stock in the corporation, Hamilton & Company, Inc., was issued as follows: J. Ralph Hamilton
324 shares
W. H. Bryant
25 shares
Leota T. Houser
1 share
Total
350 shares
On August 26, 1952, the petitioner corporation purchased from W. H. Bryant for $5,000 the 25 shares of stock which had been issued to him. The 25 shares are now held by the petitioner corporation as treasury stock. During the years 1953 and 1954 the petitioner realized the following commissions on insurance sales and renewals: Type of Insurance
1953
1954
Accident and Health
$ 230.36
$ 262.64
Bond
4,630.07
6,218.87
Burglary
1,217.68
1,182.66
Fire
36,522.45
43,903.35
Liability
24,785.31
24,500.37
Life
301.21
Plate Glass
224.69
504.42
Total commissions
earned
$67,610.56
$76,873.52
Beginning with the year 1953, Clyde Pippin, vice president, *94 individually handled real estate transactions. The corporation did not employ any insurance salesmen as such. The other two officers of Hamilton & Company, Inc., were W. H. Bryant, who was an insurance clerk, and Leota Houser, who was bookkeeper and also an insurance clerk. Hamilton & Company, Inc., had no outside salesmen in 1953 or 1954. In August 1932 petitioner was financially insolvent. A large amount of the business that was on the books in 1930 had departed by 1934 due to depression times and existing financial conditions, and Hamilton & Company, Inc., was not able to regain the lost accounts. By 1945, at the time of Hamilton's return from military service in World War II, insurance commissions received by Hamilton & Company, Inc., amounted to $22,517.35. By 1954, these commissions had increased to $76,873.52. This growth from 1945 to 1954 was primarily due to the business ability and personal contacts of Hamilton. Approximately 85 per cent of the income of Hamilton & Company, Inc., for 1953 and 1954 was from insurance commissions. Around 90 per cent of these accounts was brought in and maintained by Hamilton due to his personal ability and business acquaintanceships. *95 During the years 1953 and 1954 the office of Hamilton & Company, Inc., was open on Monday through Saturday each week except that it closed Wednesday and Saturday afternoons. Hamilton ordinarily worked during the regular office hours except for vacations and occasional business trips. Hamilton was considered one of the best businessmen in Calhoun County and his opinion on any business or financial matter was frequently sought and respected. His adjusted gross income reported on his personal Federal income tax return for the year 1953 was $115,192.54, and for the year 1954 was $152,612.65. The prevailing percentage of insurance commissions in the Calhoun County area where Anniston is located, which was the principal place of business of the corporation, on fire, liability and like insurance brokered through another company is between 50 and 60 per cent of the net commissions earned on the sale of the insurance. If Hamilton had been a broker for another company and had earned $60,000 in commissions, the sales commission to him would have been between 50 and 60 per cent of the earned commissions allowed by the insurance company that actually wrote the risk. The net income of Hamilton *96 & Company, Inc., reported for the year 1953 was $840.23 and for the year 1954 was $10,179.44. During the years 1953 and 1954, Hamilton was paid a salary from Hamilton & Company, Inc., of $30,000 a year, which was for services rendered and actually performed by him for the corporation. The amount which he personally earned for the corporation in these 2 years was in excess of the salary paid. The same salary of $30,000 per year was paid Hamilton by the corporation during each of the prior years 1951 and 1952. In addition to his employment with the petitioner corporation, Hamilton had other employment and earnings therefrom during the years 1953 and 1954 as follows: Income
Business
Position
1953
1954
Interstate Roofing Co., Inc.
Director
$ 6,000.00
$ 7,200.00
Anniston National Bank
Chairman of Board
7,200.00
Attalla Pipe and Foundry Company
Executive Vice President
and Director
3,850.00
Draper & Company
3,000.00
Bank of Heflin (Ala.)
President
900.00
1,900.00
Provident Life and Accident Company
Agent
2,475.13
2,644.90
Alabama Pipe Company
Director
5,000.00
5,000.00
$17,375.13
$27,794.90
Hamilton's authorized *97 salary, according to the minute book of the corporation, was $16,500 in each of the years 1953 and 1954. In addition, he was authorized a bonus of $6,000 in July and December in each of the years to bring the total authorized compensation to $28,500; however, he received $30,000 in each of the years. The record does not contain any explanation for the additional amount received. Hamilton & Company never authorized or paid any formal dividends to its shareholders. The total salaries paid by petitioner to all officers and employees during the years 1953 and 1954 amounted to $59,853.33 and $62,058.64, respectively. Of these amounts, J. Ralph Hamilton received 50.1 per cent for the year 1953 and 48.3 per cent for the year 1954. Hamilton & Company advertised its insurance business in 1953 and 1954 through newspapers and by mailing calendars to all of its customers with their individual names printed on them, by sending out diaries to customers, by giving Christmas remembrances and by means of calendars bearing the name of Hamilton & Company showing that it was an insurance agency. Opinion We are asked to decide whether the salary paid to petitioner's president, who owned practically *98 all of petitioner's stock, was reasonable for the years 1953 and 1954. The salaries and bonuses in each year totaled $30,000 and are in the same amount as was paid Hamilton in the two previous years of 1951 and 1952. The practice of paying bonuses in addition to the fixed salary was one that had been long followed, and the two other officers are likewise paid bonuses as well as fixed salaries. The business of petitioner was primarily the writing of fire and casualty insurance, and the evidence is clear that Hamilton was personally responsible for earning 90 per cent of these commissions. It was Hamilton's contacts that made this possible. He was an outstanding businessman in Anniston, Alabama, and was financially interested in a large number of business enterprises, the best known of which are listed in our findings. That he was the driving force in the business seems undisputed. The testimony is that if Hamilton had brokered the insurance he secured, he would have earned more than the amount paid to him by way of salary as president of the petitioner. While salaries paid to officers who substantially own a corporation need to be carefully scrutinized to see if what they receive *99 as salary is reasonable in amount and is proper for the services rendered, once it is determined that the amount paid is reasonable, the taxpayer has proven its right to the deduction. The fixing of salaries is a matter for the corporate directors in the first instance and this is true even though the corporation is a so-called close corporation. If the salary fixed is a reasonable one in all the circumstances, it must be allowed even though a different and smaller amount might be fixed by someone else, for what is a reasonable salary is not a mathematical sum but what is fair and just in all the circumstances. Hamilton was personally in a very high income tax bracket and at a rate higher than the corporate rate paid by petitioner. There is no pattern of tax avoidance present. We think the petitioner should prevail. Decision will be entered for the petitioner.